## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| EDGARDO RAFAEL CUBAS, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-10-604 |
| | § | |
| RICK THALER, | § | |
| | § | |
| *Respondent*. | § | |

## MEMORANDUM OPINION AND ORDER

Edgardo Rafael Cubas ("Cubas"), an inmate on Texas' death row, has filed a petition seeking federal habeas corpus relief. Respondent Rick Thaler ("Respondent") has filed an answer and has moved for summary judgment. Dkt. 13. After considering the record, the pleadings, and the applicable law, the Court finds that Cubas has not shown an entitlement to habeas relief. Accordingly, the Court will **GRANT** Respondent's summary judgment motion and **DENY** Cubas' habeas petition.

## BACKGROUND

The issues raised by Cubas' federal habeas petition only require a brief review of his crime. On January 22, 2002, an individual found the partially nude body of fifteen-year-old Esmeralda Alvarado in a secluded area of Harris County. Four days earlier, Ms. Alvarado disappeared after leaving her boyfriend's house to use a pay phone. Police investigation showed that Ms. Alvarado died from a single gunshot to the head. Her body bore signs of sexual trauma.

Several months passed without any leads. Finally, Cubas' co-defendant Walter Sorto

("Sorto") incriminated him in the duo's nine-month crime spree, of which Ms. Alvarado's murder was only one incident.  On August 21, 2002, the police arrested Cubas.  Cubas gave the police five videotaped statements over a two-day period.[1]  Cubas' statements chronicle several robberies, rapes, and murders he committed with Sorto.  With regard to Ms. Alvarado's murder, Cubas explained that he and Sorto were driving around when they saw her talking on a pay phone.  Intending to rob her, Sorto forced Ms. Alvarez into the vehicle.  After unsuccessfully searching her for money, Cubas began raping Ms. Alvarez.  The two men drove to various locations and took turns sexually assaulting her.  Finally after traveling to a secluded area, Sorto told Cubas that they would have to kill Ms. Alvarez so that she could not identify them.  Cubas originally told the police that Sorto fired the killing shot.  In Cubas' final statement given to Houston Police Department Officer Xavier Avila, he admitted that he shot Ms. Alvarez.  (Tr. Vol. 39, State's Exhibit 7C).[2]

The State of Texas charged Cubas with capital murder committed during a sexual assault.  The trial court appointed Gilberto Villareal and Frances Northcutt to represent Cubas.  Trial counsel faced a difficult challenge.  Cubas had confessed to the murder.  Forensic evidence verified the story that he had related to police officers.  Trial counsel adopted the strategy of attacking the admissibility of the various police statements.  After a hearing on Cubas' motion to suppress, the trial court found that one statement in which

---

[1]     The police interviewed Cubas, a native of Honduras, in Spanish.

[2]     The State of Texas charged Sorto with the rape and murder of two women.  Sorto received a death sentence for that crime which he committed with Cubas.  *Sorto v. State*, 173 S.W.3d 469 (Tex. Crim. App. 2005).

Cubas discussed some extraneous offenses was inadmissible.  The trial court found no constitutional violation in the taking of his other statements, including the one where Cubas admitted that he shot the victim.  Still, trial counsel asked the jury to discount Cubas' statements because the police had allegedly coerced his confession.  Conceding that he was guilty of some crime, the defense particularly tried to cast doubt on Cubas' final statement. The jury instructions, however, allowed for his conviction if (1) he actually killed the victim; (2) he was a party to the offense; or (3) he conspired to kill her.  Clerk's Record at 536-38.[3] Even without his admission to being the shooter, the evidence easily allowed the jury to find him a party to the murder.  The jury found him guilty.  Clerk's Record at 545.

The jury would decide Cubas' fate after the presentation of evidence in a separate penalty phase.  The State presented extensive testimony in the sentencing hearing about Cubas' involvement in numerous aggravated robberies, sexual assaults, and even other murders.  The parade of witnesses portrayed Cubas as an extremely violent man.  Even during his pretrial detention, he repeatedly fought with other inmates and resisted attempts

---

[3]      Under Texas' law of the parties "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminal responsible, or by both."  TEX. PENAL CODE 7.01.  A defendant is guilty under a conspiracy liability theory if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]"  TEX. PENAL CODE 7.02(b).

to squelch his violence. The evidence left little question that Cubas would be a future danger to society.

The defense called several witnesses to testify about Cubas' background. Witnesses described Cubas' difficult childhood in Honduras, positive work history, healthy relationships with loved ones, dedication to his family, and good character. Some witnesses expressed surprise at Cubas' crimes. Cubas' father attributed his lawlessness to manipulation by others. A psychologist confirmed Cubas' susceptibility to negative influences, particularly that of co-defendant Sorto. The psychologist, however, opined that a secure setting would reduce Cubas' risk for continued violence.

The jury determined Cubas' sentence by answering three special issue questions: (1) would Cubas "commit criminal acts of violence that would constitute a continuing threat to society"; (2) did Cubas "actually cause[] the death of Esmeralda Alvarado . . . intend[] to kill Esmeralda Alvarado or . . . anticipate[] that a human life would be taken"; and (3) did "a sufficient mitigating circumstance or circumstances . . . warrant that a sentence of life imprisonment rather than a death sentence be imposed." Clerk's Record at 549-551. The jury's answers resulted in a death sentence.

Cubas appealed his conviction and sentence to the Texas Court of Criminal Appeals.[4] Cubas' appeal focused on the admissibility of his statements and constitutional concerns about Texas' special issue questions. The Court of Criminal Appeals affirmed in an

---

[4]     Dick Wheelan (hereinafter "appellate counsel") represented Cubas on direct review.

unpublished opinion. *Cubas v. State*, 2005 WL 3956312 (Tex. Crim. App. 2006) (hereinafter "Opinion on Direct Appeal at ___").

During the pendency of his direct appeal, Cubas filed a state application for a writ of habeas corpus raising forty-four claims. The state district court issued detailed findings of fact and conclusions of law recommending that the Court of Criminal Appeals deny habeas relief. State Habeas Record at 686-724. The Court of Criminal Appeals adopted the lower court's recommendation without alteration. *Ex parte Cubas*, No. 71,259-01 (Tex. Crim. App. Feb. 25, 2009). Federal review followed.

This Court appointed counsel to represent Cubas throughout his federal habeas proceedings. Cubas has filed a lengthy habeas corpus petition raising the following grounds for relief:

1. The trial judge's actions in an ongoing federal habeas proceeding violated Cubas' due process rights.

2. The trial judge's direct, personal, and substantial interest in the outcome of Cubas' case deprived him of due process.

3. The trial court violated the 8th and 14th Amendments by failing to instruct prospective jurors during voir dire that capital murder requires a specific intent to kill.

4. The trial court violated the 8th and 14th Amendments by instructing prospective jurors that they were to consider mitigating evidence in the same manner as they did evidence under the future dangerousness issue.

5. The trial court's use of hypothetical examples during voir dire placed a burden of proof on the defense in violation of the 6th, 8th, and 14th Amendments.

6.      The trial court's hypothetical examples during voir dire effectively nullified the mitigation special issue.

7.      Texas' capital sentencing scheme improperly assigns the defense a burden of proof on the mitigation issue in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

8.      Texas' mitigation special issue sends mixed signals to the jury.

9.      Law enforcement officers violated the 5th and 14th Amendments when taking Cubas' statements.

10.     Law enforcement officers violated the 5th and 14th Amendments when taking Cubas' statements regarding extraneous offenses.

11.     A law enforcement officer violated the 5th and 14th Amendment by continuing to interview Cubas after an improperly taken statement.

12.     The final statement taken by law enforcement officers violated Cubas' 5th and 14th Amendment rights.

13.     Cubas' first and last police statements were inadmissible under *Missouri v. Seibert*, 542 U.S. 600 (2004).

14.     Cubas' first, second, third, and fourth statements relating to extraneous misconduct were inadmissible under *Seibert*.

15.     Trial counsel provided ineffective assistance by failing to object to the trial court's repeated hypothetical examples of mitigation evidence.

16.     Trial counsel provided ineffective assistance by failing to object to the trial court's repeated hypothetical examples including the future dangerousness special issue.

17.     Trial counsel provided ineffective assistance by not objecting to the trial court statements during voir dire about the State's burden of proof.

18.     Trial counsel should have objected when the State's voir dire questioning did not discuss a specific intent to kill.

19.     Trial counsel should have objected when the State's questioning

suggested that there needed to be a "nexus" between Cubas' mitigating evidence and his crime in answering the mitigation special issue.

20. Appellate counsel failed to raise the issue of the "mixed signals" sent by the mitigation issue.

21. The question of appellate counsel's failure to raise the "mixed signals" claim was not subject to the rule of "futility" and "novelty."

22. Appellate counsel failed to argue that the police took Cubas' statements in violation of *Seibert*.

23. The trial court violated Cubas' rights with respect to peremptory challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986).

24. Texas law violated the 6th and 14th Amendments by excluding polygraph evidence.

25. The Texas evidentiary rule permitting wide-open cross-examination of all witnesses precluded Cubas' ability to testify on the limited question of the voluntariness of his statements.

26. The trial court abused its discretion by excluding an exhibit at trial.

27. The trial court denied Cubas his 6th and 14th Amendment rights by excluding an exhibit at trial.

28. Appellate counsel denied Cubas' rights by not raising the exclusion-of-trial-exhibit issue.

29. Cubas is ineligible for a death sentence.

30. Texas law violated the Constitution by allowing the sentencing of one ineligible for a death sentence.

31. The application of Tex. Penal Code Ann. § 7.02(b) to Cubas' case violates the 6th and 14th Amendments.

32. The punishment-phase jury charge violated the Sixth Amendment by misleading the jury as to the numerical requirements for answering the special issue questions.

33.    The punishment-phase jury charge violated the Eighth Amendment by misleading the jury as to the numerical requirements for answering the special issue questions.

34.    The punishment-phase jury charge violated Cubas' due process rights by misleading the jury as to the numerical requirements for answering the special issue questions.

35.    Appellate counsel violated Cubas' rights by not raising a claim asserting his argument that the jury instructions misled the jury about the numerical requirements for a life sentence.

Respondent has filed an answer and motion for summary judgment. Respondent argues that procedural rules prevent this Court from reaching the merits of many claims. Also, Respondent claims that the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") precludes relief on all issues raised by Cubas' petition. Dkt. 13. Cubas has filed a response. Dkt. 21. In addition, Cubas has filed a motion for an evidentiary hearing. Dkt. 22. Cubas' petition is ripe for adjudication.

## LIMITATIONS ON FEDERAL HABEAS REVIEW

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 780 (2011). Federal habeas corpus review provides an important, but limited, examination of state criminal judgments. Because "state courts are the principal forum for asserting constitutional challenges to state convictions," *id.* at ___, 131 S. Ct. at 787, concerns for comity, federalism, and finality channel the course of federal habeas review. *See Calderon v. Thompson*, 523 U.S. 538, 555-56 (1998); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). *Engle v. Isaac*, 456 U.S. 107, 128 (1982). Accordingly, the path of state court litigation –

8

both procedurally and substantively – determines the scope of federal habeas review.

How an inmate has litigated his claims determines what issues a federal court can adjudicate. The AEDPA requires the exhaustion of available state remedies before federal review becomes available. *See* 28 U.S.C. § 2254(b)(1). As a corollary to the exhaustion doctrine, independent and adequate state procedural law may bar federal habeas review. If an inmate fails to follow well-established state procedural requirements for attacking his conviction or sentence, and the state court thereby finds that he has defaulted judicial review, a procedural bar forecloses federal adjudication. *See Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 732 (1991); *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001). "This doctrine ensures that federal courts give proper respect to state procedural rules." *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997); *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (finding the cause and prejudice standard to be "grounded in concerns of comity and federalism").

Once a state court has reached the merits of an inmate's claims, the AEDPA provides for a forgiving federal review. The AEDPA "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)." *Richter*, ___ U.S. at ___, 131 S. Ct. at 784. Under those provisions, "a federal court cannot grant a petition for a writ of habeas corpus unless the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins*, ___ U.S. ___, 130 S. Ct. 2250, 2258 (2010) (quoting

28 U.S.C. § 2254(d)(1)).[5]  "The question under [§ 2254(d)] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004); *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002).  Simply put, the AEDPA "prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, ___ U.S. ___, 130 S. Ct. 1855, 1866 (2010).

Federal courts also generally presume all state factfindings to be correct.  *See* 28 U.S.C. § 2254(e)(1).  This deference limits a federal habeas court's ability to allow new factual development.  *See* 28 U.S.C. § 2254(e)(2).  Cubas has filed a motion for an evidentiary hearing. Dkt. 22. The AEDPA "strongly discourage[s]" inmates from presenting new evidence in federal court.  *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1401 (2011).  "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor*, 529 U.S. 420, 437 (2000); *see also Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1400-01 (finding that the AEDPA "imposes a limitation on the discretion of federal habeas

---

[5]      The Supreme Court has clarified that relief lies under section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts"; or (2) "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also Thaler v. Haynes*, ___ U.S. ___, 130 S. Ct. 1171, 1174 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).

courts to take new evidence in an evidentiary hearing"). Even when authorized by the AEDPA, federal law then leaves "[t]he decision whether to conduct an evidentiary hearing . . . to the sound discretion of the district court[.]" *Barrientes v. Johnson*, 221 F.3d 741, 770 (5th Cir. 2000). Because this Court's review of the record, the pleadings, and the law indicates that an evidentiary hearing is not necessary for a fair adjudication of Cubas' claims, the Court will deny his motion for an evidentiary hearing.

## PROCEDURAL ADEQUACY OF CUBAS' CLAIMS

Respondent argues that the operation of Texas state law prevents the Court from adjudicating many of Cubas' claims. As previously mentioned, "adequate and independent state law procedural grounds" can bar federal review. *Dretke v. Haley*, 541 U.S. 386, 392-93 (2004); *see also Coleman*, 501 U.S. at 729. The state courts relied on two procedural rules to foreclose state habeas review. First, the state habeas court found that Texas' contemporaneous objection rule prevented habeas review of claims 1 though 6 and 8. The contemporaneous objection rule requires "a party to preserve an issue for appellate review" by making "a timely objection with specific grounds for the desired ruling[.]" *Livingston v. Johnson*, 107 F.3d 297, 311 (5th Cir. 1997). The Fifth Circuit "has consistently held that the Texas contemporaneous objection rule constitutes an adequate and independent state ground

that procedurally bars federal habeas review of a petitioner's claims." *Fisher v. Texas*, 169

F.3d 295, 300 (5th Cir. 1999); *see also Cotton v. Cockrell*, 343 F.3d 746, 754 (5th Cir. 2003).

Second, Respondent argues that the "*Gardner* rule" bars claims 9, 10, 23 through 27,

and 32 through 34.  Under *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996),

"claims which should have been raised on direct appeal are procedurally defaulted" when

raised for the first time on state habeas review.  *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th

Cir. 2005).  The Fifth Circuit has explicitly held that "the *Gardner* rule set forth an adequate

state ground capable of barring federal habeas review."  *Busby v. Dretke*, 359 F.3d 708, 719

(5th Cir. 2004); *see also Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007); *Finley

v. Johnson*, 243 F.3d 215, 219 (5th Cir. 2001); *Soria v. Johnson*, 207 F.3d 232, 249 (5th Cir.

2000).  Accordingly, Cubas has defaulted federal consideration of claims 1 through 6, 8

through 10, 23 through 27, and 32 through 34.

Although Cubas defaulted numerous claims, judicial accommodation prevents a state

procedural default from becoming an insurmountable barrier to federal review.  The Supreme

Court excuses a procedural bar if an inmate "can demonstrate *cause* for the default and *actual

prejudice* as a result of the alleged violation of federal law, or demonstrate that failure to

consider the claims will result in a *fundamental miscarriage of justice*."  *Coleman*, 501 U.S.

at 750 (emphasis added).  A petitioner shoulders the burden of overcoming this procedural

hurdle.  *See McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).

In response to the summary judgment motion, Cubas disputes the procedural bar of claims 1 and 2. Cubas does not, however, provide any reason to supercede the state court's finding that he defaulted consideration of his other barred claims. As Cubas' arguments regarding claims 1 and 2 implicate the same factual basis as the merits of those claims, the Court will address those issues in a separate section that follows below. State law otherwise bars this Court from addressing the merits of claims 3 through 6, 8 through 10, 23 through 27, and 32 through 34.

Accordingly, this Court can only review the merits of claims 7, 11 through 22, 28 through 31, and 35. In the interest of justice, and because several procedurally deficient claims relate to issues fully available for federal review, the Court will alternatively address the merits of the barred claims.[6]

## ANALYSIS OF THE MERITS

## I.      ALLEGATIONS OF JUDICIAL BIAS (claims 1 and 2)

Cubas alleges that the judge who presided over his trial, the Honorable Jan Krocker, presiding judge of the 184th District Court for Harris County Texas, was biased against him. Cubas primarily points to extraneous efforts Judge Krocker took in a federal habeas corpus proceeding as evidence of her prejudice against him. The Court will discuss the background of this claim before turning to its procedural viability and merits.

---

[6]      For example, claim 4 rests on the same factual basis as claim 16, claims 5 and 6 relate to claim 15, and claims 7 and 8 relate to claims 20 and 21. Only claims 23, 24, and 25 do not relate to issues fully before the Court. The Court has reviewed the substance of those claims and alternatively denies them on the merits without further discussion.

A.      **Background**

Before being elected to the bench, Judge Krocker served as an assistant district attorney in Harris County from 1981 to 1991.  In 1987, Judge Krocker prosecuted a capital murder case against Martin Allen Draughon.  After he received a death sentence and unsuccessfully sought state review, Draughon petitioned the federal district court for habeas corpus relief.  *Draughon v. Dretke*, H-02-CV-1679.  In his federal action, which ran concurrent to Cubas' trial proceedings, he alleged that the prosecution suppressed evidence as understood by *Brady v. Maryland*, 373 U.S. 83 (1963).  Specifically, Draughon claimed that Judge Krocker failed to turn over a statement by a co-perpetrator and to disclose an agreement between herself and a witness.  Also, Draughon alleged that the prosecutor's arguments before the jury amounted to misconduct.

Judge Krocker took an unusually active role in refuting the allegation that she suppressed evidence.  After the district court scheduled an evidentiary hearing, Judge Krocker filed a motion to intervene as a party.  *Draughon v. Dretke*, H-02-CV-1679, Dkt. 59. Judge Krocker worried that a ruling in Draughon's favor on his *Brady* claim would taint her professional reputation, subject her to civil liability, and open her up to professional sanctions.  Also, Judge Krocker expressed concern that the Respondent had pursued an unwise habeas litigation strategy.  Judge Krocker feared the outcome of Draughon's petition

because the parties had not identified her as a witness in a scheduled evidentiary hearing, and she alone could provide important detailed relating to the *Brady* claim.[7]

The district court denied Judge Krocker's motion to intervene.  Acknowledging that Judge Krocker "asserted that she possesse[d] relevant information that the parties have not developed," however, the district court allowed her to "submit the information she believe[d] relevant to [the] habeas petition by affidavit[.]"  *Draughon v. Dretke*, H-02-CV-1679, Dkt. 66.  Judge Krocker then secured several affidavits in an attempt to show that she had not hidden agreements with witnesses.  *Draughon v. Dretke*, H-02-CV-1679, Dkt. Nos. 76-88. While the district court granted relief on another issue, the district court ultimately found that Draughon's *Brady* claim lacked merit.  *Draughon v. Dretke*, H-02-CV-1679, Dkt. 111. Draughon did not seek appellate review of the *Brady* issue.  *Draughon v. Dretke*, 04-70043 (5th Cir).

On state habeas review, Cubas argued that the alignment of interests in the *Draughon* case made Judge Krocker biased against him.  Cubas argued that Judge Krocker's actions made her effectively a member of the prosecutor's office, with her concern for the integrity of Draughon's conviction and sentence spilling over into his own case.  In essence, he

---

[7]     The State of Texas through the respondent objected to Judge Krocker's motion to intervene, arguing that "the underlying impetus for Judge Krocker's motion is personal[.]" *Draughon v. Dretke*, H-02-CV-1679, Dkt. 65 at 2.  Draughon's response to her motion foreshadowed the current issue before the Court by stating that calling her as a witness would "obviate the potential problems that may arise from a sitting judge acting in a case as an advocate for (the state's) position."  *Draughon v. Dretke*, H-02-CV-1679, Dkt. 63 at 4, n.1.

asserted that Judge Krocker's interest in keeping Draughon on death row prison dovetailed into seeing him receive a similar fate.

The state habeas court denied relief on procedural and substantive grounds. As a procedural matter, the state habeas court applied Texas' contemporaneous objection rule because trial counsel had not complained about bias at trial. State Habeas Record at 688. Substantively, the state habeas court provided several reasons for finding that Judge Krocker was not biased against Cubas. The state habeas court first emphasized that the two proceedings were unrelated: "no aspect of the [Cubas'] case had any relation to the trial or subsequent appeals, including habeas appeals, of defendant Martin Allen Draughon." State Habeas Record at 688. Importantly, "Judge Krocker had no role in the preparation, investigation, or prosecution of the instant capital murder case." State Habeas Record at 688. The state court observed that any alleged bias could not have been pervasive; trial counsel did not know about her actions in *Draughon* and were not sure they would have objected had they known. Also, the state habeas court found that Judge Krocker's rulings did not hint of any prejudice against him. State Habeas Record at 688-89. In conclusion, the state habeas court found that Cubas "was provided an impartial and disinterested tribunal with respect to the instant capital murder trial and [his] allegations of bias regarding Judge Krocker are speculative, unpersuasive, and not supported by the record." State Habeas Record at 690.

## B.     Procedural Bar

While he did not provide any reason to forgive the procedural bar of his other claims, Cubas argues that the contemporaneous objection rule should not preclude federal

adjudication of his first and second claims. The contemporaneous objection rule penalizes a defendant who withheld an objection from the trial court. Here, the state habeas court found that counsel raised no trial objection and thus had not preserved error with regard to Judge Krocker's alleged bias. State Habeas Record at 715. Trial counsel provided an affidavit, however, attesting that they did not know about Judge Krocker's activity in *Draughon*. State Habeas Record at 207-08. Based on that affidavit, Cubas makes two arguments to overcome the procedural bar.

First, Cubas complains that trial counsel could not have objected without knowledge of Judge Krocker's activity in *Draughon*. Essentially, he argues that the trial court never should have barred his judicial-bias claims.[8] Federal habeas courts, however, lack the power to correct errors in the application of state law or reconsider whether a state court improperly applied its own procedure.[9] If otherwise independent and adequate, this Court generally must

---

[8]      Pointing to *Marin v. State*, 851 S.W.2d 275, 278-79 (Tex. Crim. App. 1993), which created a "framework for deciding whether certain rights are forfeitable, waivable, or non-forfeitable and require objection, or implementation, by the accused," (Dkt. 21 at 2), Cubas argues that the state courts have carved out categories of claims, such as judicial bias, that require no trial objection. The Court of Criminal Appeals, however, has reserved the question of whether a claim of judicial bias can proceed without a trial objection. *See Chanthakoummane v. State*, 2010 WL 1696789, at *11 (Tex. Crim. App. 2010) (unpublished); *Brumit v. State*, 206 S.W.3d 639, 644-45 (Tex. Crim. App. 2006). Cubas has not shown that the Texas courts do not regularly apply the contemporaneous objection rule to judicial bias claims.

[9]      Federal law has long refused to reexamine whether a state court erred in applying its own procedural rules. *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Poland v. Stewart*, 169 F.3d 573, 584 (9th Cir. 1999), ("Federal habeas courts lack jurisdiction . . . to review state court applications of state procedural rules."); *Sweet v. Delo*, 125 F.3d 1144, 1151 (8th Cir. 1997) ("If the highest court of Missouri concludes [an inmate's] claims have not been properly raised in a state habeas proceeding, that is the end of the matter"); *Schleeper v. Groose*, 36 F.3d 735, (continued...)

honor a State's application of its own law.  *See Barnes v. Thompson*, 58 F.3d 971, 974 n.2 (4th Cir. 1995) ("A basic tenet of federal habeas review is that a federal court does not have license to question a state court's finding of procedural default, if based upon an adequate and independent state ground.").  Cubas' argument about the misapplication of state law, therefore, does not invalidate the procedural bar.

Second, Cubas argues that he can show cause and actual prejudice that will forgive the procedural bar.  Arguably, Cubas has shown that trial counsel's ignorance about Judge Krocker's actions should operate as "cause."  Trial counsel averred that they did not know about her activity in the *Draughon*, thus preventing them from objecting at trial.  Cubas, however, must also show "actual prejudice as a result of the alleged constitutional violations."  *Coleman*, 501 U.S. at 745.  "The Supreme Court has been reluctant to define the precise contours of the prejudice requirement."  *Barrientes v. Johnson*, 221 F.3d 741, 769 (5th Cir. 2000).  One focus of the actual-prejudice inquiry, however, is the fundamental fairness of trial.  *See Strickler v. Greene*, 527 U.S. 263, 290-91 (1999).  Reviewing the fundamental fairness of Cubas' trial requires the Court to evaluate the substance of Cubas' judicial-bias claim (though the law has not clarified how that analysis differs from a merits review).  Because the state habeas court decided "[a]lternatively [that Cubas] fail[ed] to demonstrate that he was denied an impartial and disinterested tribunal during the instant

---

[9]      (...continued)

737 (8th Cir. 1994) (finding that "a state's misapplication of its own procedural rule is not cause for default" because "[a] federal court may not re-examine a state court's interpretation and application of state law").

capital murder trial," State Habeas Record at 715, the Court's review focuses on the AEDPA standard. In doing so, and for the same reasons the Court will discuss below, an alternative review of the merits confirms that Cubas has not shown actual prejudice to overcome the procedural bar.

## C.  Alternative Review of the Merits

Cubas argues that "Judge Krocker's simultaneous participation in the prosecution of Draughon in federal court while presidint [sic] over Mr. Cubas' State court case denied [him] the appearance of fairness that is central to the due process clause[.]" Dkt. 6 at 15. The Constitution has long held that an impartial judge is essential to the operation of due process. *See Republican Party of Minnesota v. White*, 536 U.S. 765, 775-76 (2002). Due process requires "the lack of bias for or against any *party* to the proceeding. Impartiality in this sense assures equal application of the law. That is, it guarantees to a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party." *Id.* at 776. Unfortunately, the Supreme Court's jurisprudence in this area "is long on ethics in the abstract, but short on workable rules of law." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 870 (1988) (Rhenquist, C.J., dissenting). "The conundrum is in blazing the parameters" of the due process clause's control over judicial bias. *United States v. Couch*, 896 F.2d 78, 81 (5th Cir. 1990).[10] Thus, "[b]ias is a difficult claim to sustain under AEDPA"

---

[10]     Cubas contends that Judge Krocker "possibl[y] violat[ed] the . . . Can[]ons of Judicial Conduct." Dkt. 6 at 16. The Texas Code of Judicial Conduct states that "[a] judge shall comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." TEXAS CODE OF JUDICIAL CONDUCT Canon 2A. The Texas Code
(continued...)

largely because "'what degree or kind of interest is sufficient to disqualify a judge from sitting cannot be defined with precision.'" *Buntion v. Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008) (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986)).

Because courts ordinarily "presume that public officials have properly discharged their official duties," *Bracy v. Gramley*, 520 U.S. 899, 909 (1997), "bias by an adjudicator is not lightly established." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1052 (5th Cir. 1997). The Supreme Court has recognized two categories of bias: actual and presumptive. *See Buntion*, 524 F.3d at 672. Cubas alleges that Judge Krocker's activity in *Draughon* amounted to both types of bias against him.

### 1.    *Actual bias* (claim 1)

As an initial matter, Cubas alleges that Judge Krocker displayed actual bias. In proving actual bias, a defendant must show a prejudiced disposition "*in [his] own case*." *See Bracy*, 520 U.S. at 909. As recognized by the state habeas court, Cubas' criminal action was not related to the *Draughon* proceedings. To demonstrate that Judge Krocker's actions impacted his own trial, Cubas points to various action made by the trial court which allegedly manifested actual animus against him, most of which relate to his other grounds for federal habeas relief. Cubas emphasizes that the trial court:

---

[10]        (...continued)
obligates a judge to avoid any overriding partiality or bias. TEXAS CODE OF JUDICIAL CONDUCT Canon 3B(5) ("A judge shall perform judicial duties without bias or prejudice."). This Court's concern on federal habeas review is not whether a trial judge possibly violated the canons of professional conduct, but whether the inmate's trial complied with the rigors of due process. *See Buntion v. Quarterman*, 524 F.3d 664, 671 (5th Cir. 2008) (holding that the district court erred by evaluating the state judge's behavior under the Texas Code of Judicial Conduct).

- failed to inform potential jurors that capital murder contains a specific-intent requirement (claim 17);

- gave prospective jurors an incorrect definition for the requirement that a defendant commit an "intentional" murder (claim 5);

- did not correct the prosecution when they gave prospective jurors examples of capital murder which omitted a specific intent requirement (claim 3);

- discussed the mitigation special issue with prospective jurors in a manner that linked it to the future dangerousness issue (claim 4);

- misinformed potential jurors by giving examples of mitigating evidence that did not correspond to the evidence Cubas would present in the punishment phase (claims 5 and 6);

- allowed the prosecution to discuss the special issues in a way which created an expectation that a nexus must exist between Cubas' mitigating evidence and the crime (claim 19);

- misapplied the burden-shifting procedure for evaluating the use of preemptive strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986) (claim 23);

- interrupted the defense's questioning of Cubas' father in a way that derailed the impact of his mitigation case.[11]

As the Court will discuss when addressing the related claims, Cubas has not shown

that any of these circumstances merits habeas relief on its own. More germane to the instant

---

[11]     The state habeas court balanced Cubas' list of trial court errors against a list of rulings favorable to him. State Habeas Record at 689-90.

claim, however, taken cumulatively they do not display a pervasively obvious actual bias against Cubas.

Regarding most of the examples he cites as bias, Cubas takes the circumstances out of context. For example, as the most visible bias against him Cubas points to when

> Judge Krocker admonished trial counsel for the slow manner in which he was questioning Cubas' father at a time when his testimony was most moving and effective. ([32]RR 79). The trial court's sua sponte intervention at that point interrupted the flow and impact of the petitioner's emotional evidence. When his father's testimony resumed, it was devoid of its former emotional content.

Dkt. 21 at 8. This example is fairly representative of how his allegations of bias do not show a pervading prejudice or predisposition against Cubas. Questioning that may appear "moving and effective" in the cold record may not represent the trial proceedings as viewed by the judge. The trial court interrupted counsel's questioning, asked them to approach the bench, and then reproved counsel:

> I know this is very moving testimony for the defendant's family because I can see your client crying and, of course, the witness is crying. People in the audience know somebody is crying. But it's going — I have never seen testimony go quite so slow. And I know you want some dramatic effect, but there are long pauses before . . . you ask the next question. . . . I want to give you some leeway. But at the rate its going, it's going to take two weeks to get through the family members. And I know, because I have heard you on cross, you are very well prepared; and I know you move at a good pace on cross and think fast. So, I know it is not going slowly because you're thinking of the next question. It is not difficult testimony. Just letting you know, it's got to go a touch faster.

Tr. Vol. 32 at 80-81. This brief interchange did not reveal any deep-seated prejudice, but a judicious effort to balance the defendant's right to present his case against maintaining an efficient and effective trial. *See Buntion*, 524 F.3d at 674 (finding no actual bias in much

more egregious circumstances, including the trial judge saying "he was doing 'God's work' in seeing the defendant executed and that [he] would eventually be found guilty"). Likewise, the other examples Cubas relies on do not show any overriding unfairness. The state habeas court reasonably found that Judge Krocker did not have a prejudiced disposition against Cubas. State Habeas Record at 688. Cubas has not shown actual bias.

> 2. *Presumptive bias* (claim 2)

Citing the same factual scenario, Cubas also claims that he can show presumptive bias. "Presumptive bias occurs when a judge may not actually be biased, but has the appearance of bias such that 'the probability of actual bias . . . is too high to be constitutionally tolerable.'" *Richardson v. Quarterman*, 537 F.3d 466, 475 (5th Cir. 2008) (quoting *Buntion*, 524 F.3d at 672). "Almost every bias case before the Supreme Court that has found a due process violation has done so based on presumptive bias." *Buntion*, 524 F.3d at 672. While not an exhaustive categorization of predicate circumstances, the Supreme Court has found presumptive bias in three situations:

> (1) the decision maker has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) an adjudicator has been the target of personal abuse or criticism from the party before him; and (3) a judicial or quasi judicial decision maker has the dual role of investigating and adjudicating disputes and complaints.

*Bigby v. Dretke*, 402 F.3d 551, 559 (5th Cir. 2005).  Accordingly, the AEDPA limits this Court's inquiry into whether the state court's resolution was unreasonable in light of the situations outlined by the Supreme Court.  *See Richardson*, 537 F.3d at 476.

In those instances in which the Supreme Court has found presumptive bias, the presiding authority's interest in the outcome created a "possible temptation" that would lead the average judge "not to hold the balance nice, clear and true." *Aetna*, 475 U.S. at 821.  Each circumstance, however, centered on the judge's interest in the outcome of case before the court.  Here, Cubas has not shown that Judge Krocker had any interest in him being found guilty and sentenced to death.  Her activity in *Draughon* was sufficiently attenuated so as to not spill over into Cubas' case.  Cubas has simply not shown that defending her professional reputation in *Draughon* created a biased atmosphere in his own trial.  Whatever actions she may have taken in *Draughon*, Judge Krocker's temperament, comportment, and rulings in Cubas' trial do not hint of impermissible bias or prejudgment.  No presumptive bias is evident in Cubas' trial.

"[T]o perform its high function in the best way, justice must satisfy the appearance of justice." *Aetna*, 475 U.S. at 825 (quotation omitted).  The question on federal habeas review, however, is not whether Judge Krocker's attempted intervention in Draughon's case was appropriate or wise.  The question is whether the state habeas court was unreasonable in its judgment about her activity in concurrent death-penalty cases.  Given the discrete facts of this case, the Court holds that the state court was not unreasonable in concluding that Cubas "fail[ed] to demonstrate that he was denied an impartial and disinterested tribunal

during the instant capital murder trial." State Habeas Record at 715. Accordingly, Cubas cannot show actual prejudice to overcome the procedural bar or that his claims substantively deserve habeas relief. Cubas' first and second grounds for relief are procedurally barred and, alternatively, without merit. *See* 28 U.S.C. § 2254(d)(1).

## II. CONSTITUTIONALITY OF TEXAS' MITIGATION SPECIAL ISSUE (claims 7, 8, 20, and 21)

Cubas complains that Texas' means of putting mitigating evidence before the jury violates the Constitution. His seventh argument asserts that the mitigation special issue improperly places an implicit burden of proof on the defense, thus violating *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Cubas' eighth claim argues that, without explicitly specifying which party has the burden of proof, the mitigation special issue sent "mixed signals" to the jury about how to consider his evidence.[12] Cubas' twentieth and twenty-first claims fault both trial and appellate counsel for not advancing his "mixed signal" arguments.[13]

---

[12] Cubas procedurally defaulted his eighth claim in state court. The Court alternatively finds his claim to be without merit in light of the discussion that follows above.

[13] Courts adjudicate ineffective-assistance-of-appellate-counsel claims under *Strickland*'s familiar performance and prejudice prongs. *See Henderson v. Quarterman*, 460 F.3d 654, 665 (5th Cir. 2006) (recognizing that *Strickland* applies to ineffective assistance of appellate counsel claims). A defendant alleging ineffective appellate representation "must first show that his counsel was objectively unreasonable . . . in failing to find arguable issues to appeal – that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them" and then "demonstrat[e] prejudice. That is, he must show a reasonable probability that, but for his counsel's unreasonable failure . . . he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

Inmates have repeatedly complained about ambiguity in Texas' capital sentencing statute. Because the law does not specifically allocate a burden of proof on the mitigation special issue, inmates argue that it unconstitutionally falls on the defense. The Fifth Circuit has recognized that Texas law places "[n]o burden of proof . . . for either the state or the defendant to disprove or prove the mitigating evidence. Thus, each juror individually and subjectively determines what evidence, if any, is sufficient to mitigate against the imposition of the death penalty." *Woods v. Cockrell*, 307 F.3d 353, 359 (5th Cir. 2002) (citing *Colella v. State*, 915 S.W.2d 834, 844 (Tex. Crim. App. 1995)); *see also Prystash v. State*, 3 S.W.3d 522, 535 (Tex. Crim. App. 1999). However, the practical reality of trial anticipates that a capital defendant will adduce mitigating evidence, *implicitly* placing on the defense a burden to present mitigating evidence and to convince the jury of its significance. *See Lawton v. State*, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995) ("[T]he burden is implicitly placed upon appellant to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case.").

On direct appeal, the Court of Criminal Appeals tersely dismissed Cubas' argument about the absence of an explicit burden of proof because it had "previously addressed and rejected these claims[.]" Opinion on Direct Appeal at 14. Federal law confirms that Texas' implicit assignation of a burden to the defense does not offend the Constitution. The Supreme Court "has often recognized" a distinction "between facts in aggravation of

26

punishment and facts in mitigation." *Apprendi*, 530 U.S. at 490 n.16 (citations omitted).

Supreme Court authority anticipates that

> [s]o long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.

*Walton v. Arizona*, 497 U.S. 639, 650 (1990). Even after *Apprendi*, "a state death penalty statute may place the burden on the defendant to prove that mitigating circumstances outweigh aggravating circumstances[.]" *Kansas v. Marsh*, 548 U.S. 163, 173 (2006). Thus, the Fifth Circuit accordingly has repeatedly held that Texas' failure to assign a burden of proof does not violate the Constitution. *See Druery v. Thaler*, ___ F.3d ___, 2011 WL 2859877, at *10 (5th Cir. July 20, 2011); *Adams v. Thaler*, 421 F. App'x 322, 334 (5th Cir. 2011); *Kerr v. Thaler*, 384 F. App'x 400, 403 (5th Cir. 2010); *Ortiz v. Quarterman*, 504 F.3d 492, 505 (5th Cir. 2007); *Oliver v. Quarterman*, 254 F. App'x 381, 386 (5th Cir. 2007); *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir.2007); *Granados v. Quarterman*, 455 F.3d 529, 537 (5th Cir. 2006); *Rowell v. Dretke*, 398 F.3d 370, 376-78 (5th Cir. 2005). Since no Supreme Court authority assigns a burden of proof on mitigation, this Court could not rule otherwise except by creating a new rule of constitutional law in violation of *Teague v. Lane*, 489 U.S. 288 (1989).[14] Cubas' seventh claim lacks merit.

---

[14] Federal habeas relief generally may not be premised on "a new rule" of law if the Supreme Court announced that rule after the petitioner's conviction became final, if the petitioner wishes to establish a wholly new rule, or if the petitioner seeks to apply a settled precedent in a novel way that would result in the creation of a new rule. *See Teague*, 489 U.S. at 310; *Penry v.*
(continued...)

Cubas also contends that the absence of an explicit burden of proof confused the jury. Because their instructions told the jury how to address evidence relevant to the other special issues, Cubas alleges that the jury received "mixed signals" about how to consider mitigating evidence. Cubas' use of the "mixed signals" phrase harkens to *Penry v. Johnson*, 532 U.S. 782 (2001), where the Supreme Court struck down a judicially crafted jury instruction because it was perplexing and, in effect, required the jury to answer the special issues dishonestly in order to give effect to the defendant's mitigating evidence. *Id.* at 802.

Here, the mitigation instruction that the trial court delivered did not contain the defect identified in *Penry*. In fact, the Supreme Court has described the current mitigation special issue as "[a] clearly drafted catchall instruction on mitigating evidence" whose "brevity and clarity . . . highlight[ed] the confusing nature of the supplemental instruction" they had previously condemned. *Penry*, 532 U.S. at 803. Given that endorsement, the Fifth Circuit has found no merit to similar claims raised by other inmates. *See Foster v. Thaler*, 369 F. App'x 598, 606 (5th Cir. 2010); *Manns v. Quarterman*, 236 F. App'x 908, 911-12 (5th Cir. 2007); *Oliver v. Quarterman*, 254 F. App'x 381, 385-86 (5th Cir. 2007). Cubas has not

---

[14]     (...continued)

*Lynaugh*, 492 U.S. 302, 313 (1989) (finding *Teague* applicable in the capital context). "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal government. . . . To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301; *see also Graham v. Collins*, 506 U.S. 461, 467 (1993).

shown that the state court was unreasonable in finding that the mitigating special issue does not confound a jury.

Because the state habeas court correctly found no merit to Cubas' attacks on Texas' mitigation special issue, trial and appellate counsel did not fail in their constitutional duties by not objecting on those grounds.[15]  The Court, therefore, denies Cubas' seventh, eight, twentieth, and twenty-first claims.

## III.    CUBAS' CUSTODIAL STATEMENTS TO THE POLICE (claims 9 through 14 and 22)

Cubas raises several claims relating to the various statements he made while in custody.  Cubas' ninth and tenth claims generally aver that the police took all his recorded statements in violation of his Fifth and Fourteenth Amendment rights.  In his eleventh and twelfth claims Cubas argues that the trial court should have suppressed his final police statement as it had the one taken immediately before that.  Cubas' thirteenth and fourteenth claims allege that, because the police did not advise Cubas of his rights until they began recording his statements, they were inadmissible under *Missouri v. Seibert*, 542 U.S. 600 (2004).  Finally, Cubas' twenty-second claim faults appellate counsel for not raising his *Seibert* claim on direct appeal.

### A.    Background

_____

[15]    The state habeas court found that Cubas "fail[ed] to show ineffective assistance of trial counsel based on counsel's failure to preserve error on [his] mixed signals claim."  Further, Cubas "fail[ed] to show ineffective assistance of appellate counsel based on appellate counsel not presenting such claim on direct appeal," particularly because "[a]ppellate counsel is not obligated to raise every possible claim on direct appeal, rather appellate counsel need only raise the claims that he believes have the best chance of success."  State Habeas Record at 717-18.

The police arrested Cubas at 10:35 a.m. on August 21, 2002. Over the next two days, several police officers interviewed Cubas. During that period, the police videotaped several hours of interrogations. The State wanted to introduce into evidence transcriptions from the recordings as five separate statements to the police. Cubas filed a motion to suppress his statements. The trial court held a five-day hearing to determine their admissibility. The number of police officers involved in the interviews, the number of crimes discussed, and the recording of only a portion of Cubas' police interrogation created a complex factual scenario. As discussed below, the state court only suppressed one of Cubas' statements. Thus, redacted transcripts showing Cubas' confession to Ms. Alvarado's murder came before the jury in the guilt/innocence phase. The State submitted transcripts of the four statements in the penalty phase. Both at the suppression hearing and at trial, Cubas alleged that he did not knowingly and voluntarily waive his rights. A review of testimony from the hearing, however, provides insight into the waiver of Cubas' rights.

After his arrest, police officers took Cubas to the Houston Police Department homicide office for questioning. The police did not advise him of his *Miranda* rights at that time. However, no one questioned Cubas for approximately an hour and a half. At approximately 1:15 p.m., Officers Jesus Sosa and H.A. Chavez began interrogating Cubas. Initially, they did not inform him of his rights. After approximately forty-five minutes, Cubas agreed to tell them his version of the crimes he committed with Sorto.[16] The police

---

[16]     Officer Sorto explained why he did not read Cubas his rights during this initial stages of the interrogation: "[i]f he is denying anything, there is no reason why I should read the rights." (continued...)

officers then turned on the recording equipment.  The officers took a three-part statement from 1:55 to 4:30 p.m, with each section covering a different crime.  The officers informed Cubas of his rights before each section.  Tr. Vol. 38, State's Exhibit 2A.  During that interrogation session, Cubas confessed to involvement in Ms. Alvarado's murder, but fingered Sorto as the shooter.[17]

After the first interview, Cubas agreed to show the police where the murder weapon was located.  Officer Alfredo Mares and two other officers left with Cubas at 5:30 p.m. Officers took Cubas to his apartment and another location.  Next, at 7:00 p.m. the police officers took Cubas before a magistrate from whom he received his statutory warnings.  Tr. Vol. 38, State's Exhibits 3, 3A.  The warnings informed Cubas that the police accused him of capital murder.  The police then took him to participate in a live lineup, bought him dinner, and drove him back to the Houston Police Department homicide office.

Officer Mares subsequently spoke with Cubas for forty minutes before recording his second statement at around 9:30 p.m.  Officer Mares began the recording by informing Cubas of his rights.  Tr. Vol. 38, State's Exhibit 4-B at 1-2.  In the resulting statement, Cubas confessed to his involvement in an extraneous robbery.  Officer Mares stopped the tape for

---

[16]      (...continued)
Tr. Vol. 17 at 51.

[17]      The Court of Criminal Appeals summarized this statement as: "[Cubas] told Sosa and Chavez that he and Walter Sorto saw a girl talking on a pay phone, that Sorto forced her into their car, and that they drove her to a secluded location and took turns raping her, but that Sorto was the one who shot and killed her."  Opinion on Direct Appeal at 2.

an hour before Cubas' third statement which he gave at 10:56 p.m.  After Officer Mares again read Cubas his rights, Cubas confessed to several other robberies and shootings.  Tr. Vol. 39, State's Exhibit 5-A.  A police officer then transported Cubas to the City of Houston jail for the night.

The next morning the police again took Cubas before a magistrate at around 8:00 a.m. to receive the statutory warnings.  Officer Cecil Mosqueda interviewed Cubas from 10:50 a.m. to 3:15 p.m, resulting in a fourth videotaped statement.   At one point in the interrogation, Officer Mosqueda told Cubas he was "not going to bring charges against him."  Cubas then admitted to his involvement in various extraneous offenses, including the rape and murder of two women in May 2002 for which Sorto later received a death sentence.  Officer Mosqueda, however, did not discuss the murder of Ms. Alvarado with Cubas during the interview.

Officer Xavier Avila began the final interview with Cubas late that afternoon.  After speaking with Cubas for about five minutes, Officer Avila turned on the recording equipment and read Cubas his rights.  Cubas waived his rights and described the kidnaping and sexual assault of Ms. Alvarado.  Tr. Vol. 39, State's Exhibit 7-B.  In this nearly hour-long final statement Cubas admitted that he, not Sorto, shot the victim.

## B.   The Voluntariness of Cubas' Statements (claims 9 and 10)

Cubas' ninth and tenth claims assert that he did not voluntarily and knowingly make any of his statements to the police officers.[18]  In reviewing whether an accused waived his Fifth Amendment rights in a knowing and voluntary manner, a court must address two questions: (1) was the waiver the product of intimidation, coercion, or deception; and (2) was the waiver made with a full awareness of the inmate's constitutional rights?  *See Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Hopkins v. Cockrell*, 325 F.3d 579, 583 (5th Cir. 2003). "[B]oth the characteristics of the accused and the details of the interrogation" should be considered in determining a statement's voluntariness.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

Cubas alleges that "at the very outset of his taped statements the police ignored and overwhelmed [his] desire to resist relinquishing his constitutional rights."  Dkt. 6 at 60.  The police allegedly "played games with [Cubas]" by telling him that co-defendants had confessed and by not divulging that he faced a capital-murder charge.  Pointing to his relative youth (twenty-three years old) and his lack of education, Cubas alleges that he did not understand his legal rights.  When Cubas testified in the suppression hearing, he explained that he did not comprehend his rights, even when read to him in Spanish.  His unfamiliarity

---

[18]     On direct appeal, Cubas only challenged the voluntariness of his final statement. When he tried to expand his challenge to all his police statements, the state habeas court found that failing to attack all his statements on direct appeal resulted in a procedural default.  State Habeas Record at 718.  Only that portion of Cubas' claim that attacks his final statement is fully available for federal consideration.  As the Court of Criminal Appeals' reasoning on direct appeal extends to all his statements, however, the Court will alternatively explore the voluntariness of all Cubas' statements.

with the United States' legal system compounded his confusion, making those rights "just words" to him.  Tr. Vol. 19 at 32.  An inadmissible polygraph confirmed that Cubas did not understand his rights when he confessed.  State Habeas Record at 226-35.  For those reasons, Cubas complains that the state courts should have suppressed all his statements.

The trial court held five days of testimony and argument relating to Cubas' motion to suppress.  The hearing testimony established that the police had advised Cubas of his rights in Spanish before taking each statement.  *See Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) ("Cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare."); *see also Dickerson v. United States*, 530 U.S. 428, 443 (2000).  Cubas repeatedly affirmed that he understood the warnings and did not ask the police any relevant questions.  The police officers who testified in the suppression hearing indicated that they had no reason to doubt that Cubas competently understood the legal warnings.  The officers had conducted the interrogations in Spanish.  They testified that Cubas appeared to understand his rights, they never threatened him or mistreated him, and they otherwise did not create a coercive atmosphere.  The record does not show that the officers deprived Cubas of sleep, food, or other necessary requirements.

"A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice."  *United States v. Broussard*, 80 F.3d 1025, 1033 (5th Cir. 1996).  The Court of Criminal Appeals extensively reviewed the record and found no error in the admission of Cubas' final statement.  Opinion on Direct Appeal at

8; *see also* State Habeas Record at 704.  Specifically, the Court of Criminal Appeals relied

on the trial court's reasons for allowing the final statement to come before the jury.  The trial

court explained:

> Specifically I want to note for the record for the Appellate Courts on my findings of fact that I found the demeanor of Officer Avila to be very professional on the stand and on the videotape and that he was obviously speaking with a great deal of authority.
>
> I also want to make a specific finding that when Officer Avila went over the warnings with the defendant he did it very carefully he did it very slowly he went to the trouble of finding how far the defendant went in school asking him if he preferred the warnings in English or Spanish and then went over them carefully had the defendant look at each warning and initial it.
>
> And I note for the record that Detective Avila took great care in how he gave the warnings on that fifth statement, and I think he did it as a man with authority and that he of course specifically pointed out that these – on the statement that was about to be given by the defendant could be used.  I believe – I make a finding that the defendant understood the warnings as they were given on the videotape in States Exhibit 6 and that the defendant intelligently waived his rights and that he freely, knowingly, and voluntarily entered the statement which appears on videotape No. 6.

Tr. Vol. 21 at 72-73.  The record confirms that the circumstances of Cubas' other statements

similarly did not create a coercive atmosphere that stripped him of the ability to waive his

rights voluntarily.

Against that background, the state courts reasonably found that Cubas knowingly and voluntarily waived his constitutional rights.  The Court denies Cubas' ninth and tenth grounds for relief.

### C.   Admissibility of Statements Taken After Officer Mosqueda's Improper Inducement (claims 11 and 12)

The trial court suppressed Cubas' fourth statement after finding that Officer Mosqueda made inappropriate promises during his interrogation.  Cubas argues that Officer Mosqueda' promises tainted the subsequent statement in which he confessed to being the shooter.  Accordingly, Cubas argues that the trial court should have suppressed his final police statement.

"[C]ertain promises, if not kept, are so attractive that they render a resulting confession involuntary.  A promise of immediate release or that any statement will not be used against the accused is such a promise." *Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987); *see also Morris v. Thaler*, ___ F. App'x ___, 2011 WL 1886096, at *5 (5th Cir. May 18, 2011); *United States v. Rogers*, 906 F.2d 189, 192 (5th Cir. 1990).  During the interrogation comprising Cubas' fourth statement, Officer Mosqueda made a remark that Cubas assumed to be an assurance not to prosecute him for the crimes to which he confessed:

> Officer Mosqueda:   I'm going to ask you some questions, let's see if you remember.  It's ver [sic], very important, okay?  I'm going to tell you something it's that . . . everything that, that . . . if you don't say or want to say or this, eh, *we just want to know.  We're not, not, not going to bring charges about this. Understand?  We just want to know to clarify, okay?*  Because it seems that [Sorto] already, already had

|  | been doing this a while.  Do you understand me?  *But I want to know so that we can clarify* because its several. |
|---|---|
| Cubas: | Mhm. |
| Officer Mosqueda: | Okay, You say that right now here quick you got together with him.  right? |
| Cubas: | Right. |
| Officer Mosqueda: | That's why I tell you everything. . . those, eh, I just want to know.  Do you understand me? *because we're not going to bring chr, I mean, eh, charges about that*.  Do you understand me? |
| Cubas: | Yes. |
| Officer Mosqueda: | But we want know now that, you are already here, well, ah, you know, just so that you can clean all the, your head, your chest, everything you have in thought (unintelligible).  You know? |

Tr. Vol. 39, State's Exhibit 6A, at 108-09 (emphasis added).  Officer Mosqueda then asked Cubas about numerous unsolved cases, but did not discuss the Alvarado murder.  Although Officer Mosqueda testified that he was referring to "a different case" than the one for which Cubas stood trial, Tr. Vol. 18 at 38, the trial court found that the emphasized portion of Officer Mosqueda's questioning was "a textbook example of a promise[.]" Tr. Vol. 21 at 71. By that point, however, the State had already agreed not to introduce that statement into evidence.

The trial court, nonetheless, concluded that Officer Mosqueda's promises did not invalidate Officer Avila's subsequent questioning.  The trial court found that Cubas "would not have believed that [Officer Mosqueda's improper] promise carried over to the statement

taken by Officer Avila." Tr. Vol. 21 at 73. The trial court found that Officer Avila assiduously assured that Cubas understood his rights. The circumstances surrounding his interrogation were not coercive. With those considerations, the trial court found that Cubas "freely, knowingly, and voluntarily" made his fifth statement. Tr. Vol. 21 at 73. The trial court found no constitutional infirmity in Cubas' other statements.

On direct appeal, the Court of Criminal Appeals assumed that Officer Mosqueda's interrogation had invalidated the voluntariness of Cubas' fourth statement, but nonetheless found that other factors dissipated any taint from flowing into Officer Avila's subsequent questioning: two hours had passed between the interviews, a new investigator questioned Cubas, the police read Cubas his constitutional rights again, and the police did not thereafter create a coercive atmosphere or again offer improper inducements to confess. *See Oregon v. Elstad*, 470 U.S. 298, 310 (1985) ("When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession."). The state court found that Cubas could not have reasonably believed that Officer Mosqueda's promise carried over into the interrogation conducted by Officer Avila. For the reasons fully explained by those tribunals, the state courts were not unreasonable in finding no constitutional violation in allowing the jury to consider Cubas' fifth statement.

38

In sum, Cubas fails to show that the state court's adjudication was contrary to, or an unreasonable application of, federal law. 28 U.S.C. § 2254(d)(1).[19]

### D.    Alleged Constitutional Violation Under *Seibert* (claims 13, 14, and 22)

Cubas' thirteenth and fourteenth claims allege that, because the police did not advise Cubas of his rights until they began recording his statements, they were inadmissible under *Missouri v. Seibert*, 542 U.S. 610 (2004).  His twenty-second claim faults appellate counsel for not advancing a *Seibert* claim on direct appeal.[20]

---

[19]    In the alternative, the Court of Criminal Appeals found no harm.  Fifth Amendment violations are subject to a harmless error analysis. *See Arizona v. Fulminante*, 499 U.S. 279, 310-11 (1991).  The Court of Criminal Appeals held:

> But even if we were to assume error in the admission of [Officer] Avila's statement after Mosqueda's promise appellant cannot show harm.  TEX. R. APP.P. 44.2(a). [Cubas]  asserts that his statement to [Officer] Avila was the critical confession because in it he admitted that he not Sorto was the triggerman in the Alvarado case. However the jury was authorized to convict [Cubas] as a principal or as a party to the offense.  In his first statement to [Officers] Sosa and Chavez [Cubas] admitted his own participation in the abduction rape and murder of Alvarado but targeted Sorto as the triggerman.  Even without the admission of his final statement to Avila the jury could still have convicted [Cubas] as a party to the offense.

Opinion on Direct Appeal at 9.  The jury – charged to find guilt if Cubas intended to "promote or assist the commission of the offense," Clerk's Record at 536 – had before it ample evidence through his additional statements to convict him as a party to the offense.  While Cubas now briefly mentions that the final statement would make "death more likely" (Dkt. 6 at 66), he did not argue in his appellate brief to the Court of Criminal Appeals that his final confession harmed him in the penalty phase.  Given the substantial information from the statements Cubas gave before Officer Mosqueda made his promise, the Court of Criminal Appeals could reasonably find that the final statement would not impact the jury's deliberations.

[20]    The Supreme Court decided *Seibert* after Cubas' trial but before the conclusion of his appeal.

Cubas' *Seibert* claim arises from the police's initial questioning before giving him the *Miranda* warnings. Cubas was in police custody for over three hours before Officers Sosa and Chavez informed him of his rights. Those two police officers spent between forty-five minutes to an hour with Cubas before turning on the tape recorder. Tr. Vol. 17 at 26. During that time, the officers repeatedly stepped in and out of the room. Tr. Vol. 17 at 35. The police officers described in the suppression hearing the substance of their pre-*Miranda* discussion with Cubas as follows:

> We began talking to him and explained to him what we were doing regarding the investigation and we advised him that we believed that he was involved in it. At first he denied, then we made him aware we had already interviewed Walter Sorto and Eduardo Navarro. And we showed him some photos of the – Polaroid photos of the individuals. And he believed us, and he said he was willing to talk to us.
>
> . . . .
>
> When he decided to go ahead and talk to us, he said he would tell us his version of what occurred. We went ahead and started the interview and began tape-recording the interview.

Tr. Vol. 17 at 16. At that point, the officers informed Cubas of his *Miranda* rights in Spanish. Tr. Vol. 17 at 17. During the subsequent interrogations, policemen and judicial officers repeatedly informed Cubas of his constitutional rights.

Cubas compares the police officers' approach to interrogation in this case to *Seibert*. *Seibert* addressed a specific concern: "the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession." 542 U.S. at 609. The *Seibert* plurality condemned this "question first" police tactic, "a strategy by which officials interrogate an

individual without administering a *Miranda* warning, obtain an admission, administer a *Miranda* warning, and then obtain the same admission again." *United States v. Montalvo-Rangel*, ___ F.3d ___, 2011 WL 3568954, at *3 (5th Cir. Aug. 15, 2011). Cubas claims that any questioning by the police before delivering a *Miranda* warning invalidates his later confessions.

The state habeas court found "that the facts surrounding [Cubas'] giving his videotaped statements to police regarding the instant and extraneous offenses are factually distinguishable from the situation considered by the United States Supreme Court" in *Seibert*. State Habeas Record at 704. *Seibert* does not apply when the police have not deliberately used the "question first" procedure. *See United States v. Green*, 388 F. App'x 375, 380-81 (5th Cir. 2010); *United States v. Nunez-Sanchez*, 478 F.3d 663, 668 (5th Cir. 2007). Here, the police did not secure a confession when initially questioning Cubas, only a willingness to speak with them. The record contains no admission of guilt until after the police officers informed Cubas of his *Miranda* rights. Thus, Cubas incorrectly argues that this case is like *Seibert* where "the subject matter of the first statement is . . . revisited for use against him." Dkt. 6 at 68. The record does not indicate that the police obtained pre-*Miranda* statements that Cubas subsequently reiterated. Accordingly, the state habeas court was not unreasonable in finding that the circumstances of this case differed from those the Supreme Court condemned in *Seibert*.

Cubas has not shown that the admission of his four statements violated his constitutional rights, and appellate counsel provided effective representation even though he did not advance a *Seibert* claim on direct appeal. The Court has examined each of Cubas' statements and, with the exception of the one involving Officer Mosqueda, has found that the state courts were reasonable in finding that Cubas gave each voluntarily. The Court, therefore, denies relief on claims 9 through 14 and 22.

## IV.    INEFFECTIVE ASSISTANCE OF COUNSEL DURING VOIR DIRE (claims 3 through 6 and 15 through 19)

Cubas raises four ineffective-assistance-of-counsel claims relating to the jury selection portion of trial. Cubas faults trial counsel for not objecting to: the trial court's hypothetical examples of mitigating evidence (claim 15); comments by the trial court that allegedly linked the mitigation and future-dangerousness issues (claim 16); and discussion about capital murder without mentioning any specific intent (claims 17 and 18). Cubas has also raised procedurally barred claims that relate to each of those ineffective-assistance-of-counsel claims (claims 3-6).

A reviewing court assesses counsel's representation under the standards established in *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Under *Strickland*'s two-pronged test, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). To

establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  A petitioner must also show actual prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534.

"Surmounting *Strickland*'s high bar is never an easy task," especially when considered under the AEDPA's deferential review. *Padilla v. Kentucky*, ___ U.S. ___, 130 S. Ct. 1473, 1485 (2010).  The question of "whether the state court's application of the *Strickland* standard was unreasonable . . . is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Richter*, ___ U.S. at ___, 131 S. Ct. at 785. "A state court must be granted deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* at ___, 131 S. Ct. at 785.

## A.    Statements Made by the Trial Court During Jury Selection (claims 3 through 6 and 15 through 17)

Cubas complains that the trial court made three categories of statements during voir dire that later adversely impacted the jury's deliberations.[21]  In his fifteenth claim, Cubas alleges that the trial judge's examples of what constitutes mitigating evidence "vastly exceeded" what he would adduce at trial, thus "rais[ing] the evidentiary expectations of the

---

[21]    Cubas raises several procedurally barred claims that accuse the trial court of error based on the same factual scenario.  Claims 5 and 6 relate to claim 15, claim 4 to 16, and claim 3 to 17.  If Cubas had presented those claims in an actionable manner, the Court would deny their merits for the same reasons as discussed above.

jury." Dkt. 6 at 44, 78.  During the March 30, 2004, proceedings, the trial court mentioned drug use and child abuse as possible examples of mitigation evidence.  Tr. Vol. 5 at 41-42.  On April 5, 2004, the trial court also told a panel of prospective jurors that drug use and "a horribly abusive childhood" might constitute mitigating factors.  Tr. Vol. 5 at 38-39.  On April 13, 2004, the trial court also mentioned child sexual or physical abuse as possible mitigating factors.  Tr. Vol. 13 at 47.  Cubas' mitigating evidence, however, did not consist of negative influences on his life.  Instead, his "mitigating evidence was exactly the opposite. His evidence depicted a loving, caring child born of poor circumstances in Honduras who followed his father to America where he was a loving, hard-working son and father to a young family. His psychological evidence demonstrated he was of low intellect, desirous to please, and under the influence of Walter Sorto."  Dkt. 6 at 45.  As it was, Cubas contends that the trial court's examples created such a false impression in the jurors' mind that, in essence, he bore the burden of proof.

Cubas' sixteenth claim argues that the trial court's statements in voir dire shackled the jury's review of his mitigating evidence to the future-dangerousness special issue.  As the trial judge spoke with prospective jurors, she repeatedly mentioned how particular items of evidence may resonate differently with each juror.  The trial judge explained that one juror may see a circumstance as mitigating, yet another may see it as indicative of a future societal threat.  *See, e.g.,* Tr. Vol. 5 at 41-42, Vol. 7 at 38-39, Vol. 8 at 37-38, 47.  Cubas claims that in doing so the trial court channeled his punishment-phase evidence into the future-dangerousness issue, thus "depriv[ing] [him] of the quality of mercy the mitigating evidence

44

is supposed to ensure." Dkt. 6 at 82.

Cubas' seventeenth claim faults the trial court for not specifying that capital murder includes a specific intent to kill. In various examples, the trial court identified that a murder must be intentional and that capital murder required something more than simple murder, but did not "advise the venire that there must be a specific intent to take the victim's life." Dkt. 6 at 32. Cubas claims that trial counsel performed deficiently by not objecting to those three categories of statements.

The state habeas court offered several reasons why the trial court's statements did not require an objection by defense counsel. First, the state habeas court observed that Cubas relied on "a piecemeal recitation of the trial court's statements during voir dire." State Habeas Record at 698. For example, the trial court indeed gave examples of mitigating evidence that the jury would not see at trial, but also referred to mitigating evidence broadly and using language from the special issue itself. Tr. Vol. 8 at 34-38. Additionally, a fuller review of the transcript reveals that the trial court elsewhere specified that murder must be "intentional" which "pretty much goes along with what most people think intentional means" – reserving the definition for the jury charge. Tr. Vol. 8 at 25. Cubas' selected reliance on portions of the trial transcript fails to acknowledge the whole of the proceeding.

Second, the state habeas court found that "any alleged misstatements by the trial court. . . . during voir dire were sufficiently attenuated by the court's guilt-innocence and punishment charges." State Habeas Record at 716. Much had transpired before the jury deliberated. The jury had heard significant evidence and argument in both phases of trial, making it unlikely they remembered the complained-of statements. The Supreme Court has been "skeptical that, by the time their . . . deliberations began, the jurors would have remembered the explanations given during voir dire, much less taken them as a binding statement of the law." *Penry*, 532 U.S. at 801. Given the significant amount of time, evidence, and testimony that the jury had to consider after hearing the trial court's statements, "[t]he comments of the court and counsel during voir dire were surely a distant and convoluted memory by the time the jurors began their deliberations on [Cubas' conviction and] sentence." *Id.* at 802.

Finally, the state habeas court concluded that, because "the jury was properly instructed on the applicable law in the court's guilt-innocence and punishment charges," he could not demonstrate *Strickland* error. State Habeas Record at 716. Cubas lodges no challenge to the integrity of the relevant jury instructions. Even if the jury misunderstood the trial court's statements during jury selection, the trial court delivered constitutionally sound jury instructions immediately before the jury decided Cubas' fate. Because courts presume that juries will follow their instructions, *see Zafiro v. United States*, 506 U.S. 534, 540

(1993); *Richardson v. Marsh*, 481 U.S. 200, 209 (1987), the jury charge cured any error during voir dire.

Based on the state court's sound reasoning, Cubas has not shown that trial counsel provided deficient performance by not objecting to the trial court's statements. *See Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) ("[F]ailure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness[.]"). Moreover, because Cubas has not shown that the jury misunderstood how to consider his evidence, he has not met *Strickland*'s prejudice prong. Cubas, therefore, has not shown that the state court's adjudication on this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). The Court denies claims 15 through 17 and, if a procedural bar did not foreclose federal review, claims 3 through 6.

### B.     The Prosecution's Statements During Voir Dire (claims 18 and 19)

Cubas complains that trial counsel should have made two objections to the prosecution's statements during voir dire. First, Cubas alleges that trial counsel should have objected when the prosecutor only discussed the specific intent for capital murder with a few, but not all, potential jurors (claim 18). Second, Cubas argues that the prosecution improperly suggested that jurors could only give effect to his mitigating evidence if it closely related to the facts of the crime (claim 19).

Cubas has not shown that trial counsel ignored a meritorious objection. The trial prosecutor mentioned the specific intent for capital murder with only some of the jury panelists. Cubas, however, has not identified any state or federal law requiring the trial

parties to ask the same questions of each prospective juror.  If the voir dire discussion inadequately probed prospective jurors' ability to understand specific intent, trial counsel could have clarified the issue himself.  In the end, the jury instructions immediately before deliberations provided jurors correct information about the statutory requirements for capital murder.  Cubas has not shown *Strickland* deficient performance or prejudice concerning this issue.

As to his nineteenth claim, Cubas claims that the prosecution implicitly told jurors only to consider mitigating evidence that bore some relationship to the crime.  Relying on repudiated jurisprudence that once linked mitigating evidence to the special issue questions, *see Tennard v. Dretke*, 543 U.S. 274 (2004), Cubas argues that those comments signaled to the jury that only mitigating evidence with a nexus to the crime could result in a life sentence.

Here, the prosecution briefly mentioned the idiosyncratic manner in which individual jurors may respond to mitigating evidence.  Beyond discussing the reality of how different jurors may perceive evidence, the prosecution never explicitly told jurors to only look at evidence explaining why Cubas killed.  Even if the voir dire discussion were improper, the prosecution's argument in the penalty phase did not constrict the jurors' ability to consider mitigating evidence.  The penalty-phase instructions properly instructed the jury on how to consider mitigating evidence.  Cubas has not shown *Strickland* deficient performance or prejudice with regard to this claim.

The Court finds that Cubas has not shown the state court's adjudication of his eighteenth and nineteenth claims was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## V.    INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL (claims 26, 27, 28 and 32 through 35)

Cubas attacks his appellate attorney's failure to advance certain legal issues. Courts evaluate ineffective-assistance-of-appellate-counsel claims under *Strickland*'s familiar standard. *See Henderson v. Quarterman*, 460 F.3d 654, 665 (5th Cir. 2006) (recognizing that *Strickland* applies to ineffective assistance of appellate counsel claims). For the reasons discussed below, the Court finds that his twenty-eighth and thirty-fifth claims are without merit.[22]

Cubas' twenty-eighth claim argues that appellate counsel should have complained about the trial court's refusal to admit into evidence a United States Department of State report entitled *Honduras Country Report on Human Rights Practices for 1998* which described the poverty that infests his home country and the corruption that pervades its legal system. At the suppression hearing and again at trial, Cubas tried to introduce the report into evidence. The trial court denied its admission in both situations. *See* Tr. Vol. 20 at 32-37; Vol. 36 at 141-43.

The state habeas court found that the report was not relevant to Cubas' proceedings:

---

[22]    Cubas procedurally defaulted claims 26 and 27 which seek habeas relief based on the trial court's evidentiary rulings. For those same reasons discuss above, the Court would deny Cubas' procedurally barred twenty-sixth and twenty-seventh claims if their merits were available for federal review.

"the U.S. Department of State human rights report provides only general information concerning the Honduran culture and that the report does not contain information particularized or relevant to [Cubas]." State Habeas Record at 721. While the Constitution ensures a defendant's wide-ranging ability to introduce evidence in a capital murder trial, that right does not completely insulate a defendant's evidence from traditional evidentiary strictures. A court, therefore, does not violate a defendant's rights by excluding irrelevant information from a capital jury's consideration. *See Skipper v. South Carolina*, 476 U.S. 1, 7 n.2 (1986); *Lockett v. Ohio*, 438 U.S. 586, 605 n.12 (1978).[23] The state habeas court concluded that "[b]ecause [Cubas'] proffered evidence was not particularized to [him], it was neither material nor probative of any issue before the jury[.]" State Habeas Record at 721. Accordingly, the state habeas court found that "trial court did not err in excluding [his] evidence" and appellate counsel did not provide constitutionally insufficient representation by not advancing that ground. State Habeas Record at 721.

---

[23]     The Supreme Court in *Lockett*, 438 U.S. at 604, held that the Constitution requires that a capital sentencer "not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record, and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Despite this loose language, the Supreme Court has refused to limit "the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 605 n.12. *Lockett* and its progeny never preempted or federalized a state's ability to exclude some evidence under its traditional evidentiary framework. *See Romano v. Oklahoma*, 512 U.S. 1, 12 (1994) ("The Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing procedures.").

Federal habeas courts defer to a state court's interpretation of its own law. *See Schaetzle v. Cockrell*, 343 F.3d 440, 448-49 (5th Cir. 2003) ("It is not our function as a federal appellate court in a habeas proceeding to review a state's interpretation of its own law.") (citation omitted). The proffered report did not have information particularized to Cubas' background growing up in Honduras. Because appellate counsel did not forgo reliance on a meritorious claim, the state habeas court was not unreasonable for denying relief on Cubas' twenty-eighth claim.

Cubas' thirty-fifth claim faults appellate counsel for not arguing that the instructions confused the jury by requiring unanimity for a death sentence but allowing a lesser consensus to support a life sentence. The trial court fashioned those instructions after then-effective TEX. CODE CRIM. PRO. art. 37.071, which "is commonly called the '10-12 Rule.'" *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000). The federal and state courts have repeatedly and regularly rejected claims virtually indistinguishable to the one he faults appellate counsel for not raising. *See Alexander*, 211 F.3d at 897, n.5; *Miller v. Johnson*, 200 F.3d 274, 288-89 (5th Cir. 2000); *Jacobs v. Scott*, 31 F.3d 1319, 1328-29 (5th Cir. 1994); *Resendez v. State*, 112 S.W.3d 541 548-49 (Tex. Crim. App. 2003); *Wright v. State*, 28 S.W.3d 526 537 (Tex. Crim. App. 2000); *Chamberlain v. State*, 998 S.W.2d 230 238 (Tex. Crim. App. 1999). The Supreme Court has held that "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Winnowing out weaker claims to emphasize stronger ones is the hallmark of effective

appellate advocacy.  *See Jones v. Barnes*, 463 U.S. 745, 751-52 (1983).  The state habeas court, therefore, was not unreasonable in concluding that Cubas "fail[ed] to show that appellate counsel was ineffective for not presenting on direct appeal the meritless claim regarding the '10-12 rule.'"  State Habeas Record at 722.[24]  The Court denies claims 28 and 35.

## VI.   CUBAS' CULPABILITY UNDER LAW-OF-THE-PARTIES AND CONSPIRACY LIABILITY (claims 29 through 31)

In his initial statements to the police, Cubas claimed that Sorto was the one who shot the victim.  Cubas admitted in his final statement, however, that he killed her.  The State of Texas charged Cubas as if he were the shooter.  As a safeguard, however, the jury instructions allowed for Cubas' conviction as a conspirator or party to the offense.  Cubas raises three claims objecting to the possibility that the jury convicted him as a non-triggerman.  First, Cubas contends that his conviction made him ineligible for a death sentence because, assuming that his last statement was invalid, the evidence did not show that he intended for Sorto to shoot the victim (claim 29).  Second, Cubas alleges that Texas' law-of-the-parties statute violates the Constitution because it allows for the conviction of one, such as him, who allegedly did not intend that a murder occur (claim 30).  Third, Cubas complains that the indictment did not forewarn him that Texas would rely on the law-of-the-parties or conspiracy liability against him (claim 31).

---

[24]      Claims 32 through 34 raise constitutional arguments based on Texas' "10-12" rule. Cubas procedurally defaulted those claims in state court.  Under the same well-established precedent described above, the Court would deny Cubas' thirty-second through thirty-fourth claims if he had brought them before the Court in a procedurally adequate manner.

Cubas predicates each of these claims on the alleged invalidity of his final statement wherein he admitted to being the one who fired the killing shot. This Court has already found no constitutional defect in that statement. As the state habeas court reasonably found that the State could rely on the last statement to prove his guilt, Cubas' twenty-ninth through thirty-first claims – which all rest on the assumption that Sorto was the shooter – lack merit.

Removing Cubas' final statement from the evidentiary picture before the jury, however, does not make his habeas claims any stronger. The Constitution requires that a death sentence "be tailored to [a defendant's] personal responsibility and moral guilt." *Enmund v. Florida*, 458 U.S. 782, 801 (1982). In *Enmund*, the Court held that the Eighth Amendment prohibits imposition of the death penalty on one "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.* at 797. The Constitution, however, does not prohibit execution of a defendant who did not kill or attempt to kill if the jury finds that: (1) the defendant was a major participant in the felony committed and (2) the defendant demonstrated reckless indifference for human life. *See Tison v. Arizona*, 481 U.S. 137, 157 (1987).

Here, the jury's verdict in the guilt/innocence phase did not specify whether it rested on the law-of-the-parties or on Cubas' own actions. However, the penalty phase's second special issue instructed the jury to focus on whether Cubas "actually caused the death," "intended to kill," or anticipated the killing of the victim as provided for under TEX. CODE CRIM. PRO. art. 37.071 § 2(b)(2). With the jury properly able to gauge Cubas' intent, claims

29 and 30 fail.

Cubas also argues that his conviction is invalid because the indictment did not give notice that Texas would rely on a conspiracy or party liability theory in prosecuting him. Under Texas law, "[i]t is well accepted that the law of the parties may be applied to a case even though no such allegation is contained in the indictment." *See Montoya v. State*, 810 S.W.2d 160, 165 (Tex. Crim. App. 1989); *see also Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005) ("It is well settled, and [defendant] does not contest the rule, that the law of the parties need not be pled in the indictment.") (citations omitted). The Fifth Circuit has rejected the argument that Texas must plead the law-of-the-parties in the indictment. *See Montoya v. Scott*, 65 F.3d 405, 415 (5th Cir. 1995); *Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir. 1994). Accordingly, the Court denies claims 29, 30, and 31.

## CERTIFICATE OF APPEALABILITY

The AEDPA bars appellate review of a habeas petition unless a district or circuit court certifies specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED.R.APP.P. Rule 22(b). Cubas has not sought a Certificate of Appealability ("COA"), though this Court can consider the issue *sua sponte*. *See Alexander*, 211 F.3d at 898. The Court must address whether the circumstances justify an appeal before issuing a final judgment. *See* Rule 11, RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS.

A COA may issue when "[a petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Settled precedent forecloses relief on Cubas' claims. Because Cubas has not

shown under the appropriate standard that any issue deserves appellate review, this Court will not certify any of his habeas claims for consideration by the Fifth Circuit.

## CONCLUSION

For the reasons described above, the Court finds that Cubas has not shown an entitlement to federal habeas relief. The Court **GRANTS** Respondent's motion for summary judgment. This Court **DENIES** Cubas' petition and **DISMISSES** all Cubas' claims **WITH PREJUDICE**. The Court also **DENIES** Cubas' motion for an evidentiary hearing. Dkt. 22. The Court will not issue a Certificate of Appealability.

The Clerk will provide copies of this Order to the parties.

Signed at Houston, Texas on September 16, 2011.

_____
Gray H. Miller
United States District Judge